1 | SNIPPER, WAINER & MARKOFF
2 | MAURICE WAINER (State Bar No. 121678)
3 | 270 N. Canon Drive, Penthouse
  | Beverly Hills, California 90210
4 | TELEPHONE: (310) 550-5770 ◆ FACSIMILE: (310) 550-6770
  | e-mail: mrwainer@swmfirm.com
5 |
  | Attorneys for Plaintiff
6 | FEDERAL DEPOSIT INSURANCE
  | CORPORATION, as Receiver of IndyMac
7 | Bank, F.S.B.

8

9 UNITED STATES DISTRICT COURT

10 CENTRAL DISTRICT OF CALIFORNIA

11 WESTERN DIVISION

12

| | |
|---|---|
| 13 FEDERAL DEPOSIT INSURANCE | Case No.:  CV 11-05318 ODW (JCG) |
| CORPORATION AS RECEIVER OF | |
| 14 INDYMAC BANK, F.S.B., | Hon. Otis D. Wright, II |
| 15     Plaintiff, | |
| 16   vs. | FIRST AMENDED COMPLAINT FOR: |
| 17 | |
| 18 GB ESCROW, INC., a California | 1. NEGLIGENCE |
| corporation, MESSMER REALTY | 2. NEGLIGENT |
| 19 GROUP, INC., a California | MISREPRESENTATION (2) and |
| corporation; CARINA POLLARD, an | 3. BREACH OF CONTRACT – |
| 20 individual, and DOES 1 THROUGH | THIRD-PARTY BENEFICIARY |
| 21 40, inclusive, | |
| 22     Defendants. | |

23

24

25

26

27

28

-1-

COMPLAINT

1    Plaintiff the Federal Deposit Insurance Corporation ("FDIC") as Receiver
2 of IndyMac Bank, F.S.B., for causes of action against Defendants GB Escrow,
3 Inc., Messmer Realty, Group, Inc., Carina Pollard, and Does 1 through 40
4 (collectively, "Defendants"), alleges as follows:

5                              **JURISDICTION**

6    1.   This Court has original jurisdiction of this civil action pursuant to
7 12 U.S.C. § 1819(b)(2)(A).  As a suit brought by the FDIC, this suit is deemed
8 to arise under the laws of the United States.

9                                **VENUE**

10   2.   The venue of this action in this Court is proper because a substantial
11 part of the events or omissions giving rise to the claim and the injury alleged
12 herein occurred within this District, and most of the Defendants reside in this
13 district.

14                            **THE PARTIES**

15   3.   IndyMac Bank, F.S.B. ("IndyMac") was a federally chartered
16 savings bank with its principal place of business in Pasadena, California.  On
17 July 11, 2008, IndyMac was closed by the Office of Thrift Supervision and the
18 Federal Deposit Insurance Corporation was appointed as Receiver pursuant to
19 12 U.S.C. § 1464(d)(2)(A) and 12 U.S.C. § 1821(c)(5).  The FDIC has
20 standing to prosecute this action as Receiver for IndyMac.

21   4.   Upon information and belief, Defendant GB Escrow, Inc. ("GB
22 Escrow"), is a California corporation, with a principal place of business located
23 at 12301 Wilshire Blvd. #500, Los Angeles, California 90025

24   5.   Upon information and belief, Defendant Messmer Realty, Group,
25 Inc. ("Messmer"), is a California corporation with a principal place of business
26 located at 3321 Kimber Drive, Suite A, Newbury Park, California 91320.

27   6.   Upon information and belief, Defendant Carina Pollard is an
28 individual residing in Long Beach, California.

-2-

COMPLAINT

7.    The FDIC is ignorant of the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 40, inclusive.  The FDIC is informed and believes, and on that basis alleges that each fictitious defendant was in some way responsible for, participated in, or contributed to, the matters and things of which the FDIC complains herein and in some fashion has legal responsibility therefor.  When the exact nature and identity of such fictitious defendants' responsibility for, participation in, and contribution to, the matters and things herein alleged is ascertained by the FDIC, it will seek to amend this Complaint and all proceedings herein to set forth the nature of these defendants' identities.

## FACTUAL BACKGROUND

8.    IndyMac was a federal savings bank that focused a core portion of its business on mortgage banking.

9.    On or about August 1, 2007, IndyMac funded two mortgage loans totaling $1,187,500 (a first mortgage for $1,000,000 and a second mortgage for $187,500) (collectively, the "Loans") to a borrower named William T. Carter, III (the "Borrower") for the purchase of a residential real property located at 2254 Bancroft Avenue, Los Angeles, California 90039 (the "Property").

**A.    The Loan Documents**

1.    GB Escrow acted as the closing agent on the Loans and, as such, prepared a HUD-1 Settlement Statement ("HUD-1") for the Loans.[1]  GB

---

[1] HUD-1 Settlement Statements are statutorily prescribed statements detailing the receipts and disbursements in settlement of a residential real estate transaction.  The HUD-1 itemizes all aspects of the closing for the lender, including any payments made by the borrower, money due to the seller, and any fees paid to third parties in connection with the closing.  The closing agent who prepares the HUD-1 must certify that the HUD-1 is a true and accurate account of the transaction and that he caused the funds disbursed in connection with the transaction to be disbursed in accordance with the statement.

1  Escrow owed IndyMac a duty to provide precise and correct information
2  regarding the Loans and to alert IndyMac to facts and events that might affect
3  its decision to make a loan.

4      2.    Messmer acted as the mortgage broker on the Loans and owed
5  IndyMac a duty to use care, skill and diligence to provide IndyMac with
6  correct information regarding the loans and to exercise reasonable care in
7  communicating the information to IndyMac.

8      3.    All of the loan origination and closing documents (including the
9  HUD-1) submitted to IndyMac indicated that the purchase price for the
10 property was $1,250,000.  Thus, IndyMac reasonably believed that the amount
11 of the Loans, $1,187,500, was less than the purchase price of the Property.

12     4.    Upon information and belief, however, the true purchase price for
13 the Property was $980,000, and not $1,250,000.  The FDIC's information and
14 belief is based upon the following:

15          (a)   The Property was originally listed for sale on February 12,
16                2007 for $1,029,000.  On the date of sale, however, and not
17                disclosed to IndyMac, the price was suddenly increased by
18                $221,000 to reflect a higher sales price of $1,250,000.

19          (b)   Messmer submitted several commission worksheets to
20                GB Escrow with differing breakdowns of fees and
21                commissions for the real estate agents involved in the
22                transaction.  One such worksheet reflected a purchase price
23                of $1,250,000, but another worksheet reflected a purchase
24                price of $980,000.  GB Escrow used this commission
25                worksheet (*i.e.*, the one with the $980,000 sales price) to
26                disburse commissions.

27          (c)   The HUD-1 that GB Escrow prepared reflects a
28                disbursement of $245,000 to an entity called "Investors

-4-

COMPLAINT

1                          Home Improvement, LLC," and a $25,000 credit from buyer

2                          to seller.  The sum of these two disbursements ($270,000) is

3                          exactly the difference between the $980,000 purchase price

4                          and the represented purchase price of $1,250,000.

5        5.       GB Escrow and Messmer knew, or reasonably should have

6 known, that the true purchase price for the Property was $980,000, and not

7 $1,250,000.  Despite this knowledge, all of the documents they submitted to

8 IndyMac falsely indicated that the purchase price was $1,250,000.

9 **B.**      **The Appraisal**

10        6.       On or about July 17, 2007, Pollard contracted to prepare a written

11 Uniform Residential Appraisal Report for the Property.  Pollard knew that this

12 appraisal was to be used for mortgage lending purposes.

13        7.       On or about July 17, 2007 Pollard prepared an appraisal (the

14 "Appraisal") which valued the Property at $1,250,000 as of that date.

15        8.       The appraiser's certification attached to the Appraisal expressly

16 provides in part as follows:

17                                   \*\*\*

18           2.      I performed a complete visual inspection of the

19 interior and exterior areas of the subject property.  I reported the condition of improvements in factual, specific terms.  I identified and reported the physical

20 deficiencies that could affect the livability, soundness, or structural integrity of the property.

21

22           3.      I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice...

23

24           4.      I developed my opinion of the market value of the real property that is the subject of this report based

25 on the sales comparison approach to value.  I have adequate comparable market data to develop a reliable sales comparison approach for this assignment...

26

27           5.      I researched, verified, analyzed and reported on . . . any offering for sale of the subject property in

28 the twelve months prior to the effective date of this appraisal, . . . unless otherwise indicated in this report.

COMPLAINT

6.    I researched, verified, analyzed and reported the prior sales of the comparable sales for the minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in the report.

7.    I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

\*\*\*

9.    I have reported adjustments to the comparable sales that reflect the market's reaction to the difference between the subject property and the comparable sales.

\*\*\*

12.    I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area where the property is located.

\*\*\*

14.    I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value.  I have noted in this appraisal report any adverse conditions…observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal.  I have considered these adverse conditions in my analysis of the property value, and have reported the effect of the conditions on the value and marketability of the subject property.

15.    I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this report are true and correct.

\*\*\*

23.    The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any

-6-

mortgage finance transaction that involves one or
more of these parties.

\*\*\*

25.     Any intentional or negligent
misrepresentation(s) contained in this appraisal report
may result in civil liability…

9.      Thus, Pollard was required to use reasonable care in preparation
of the Appraisal and to demonstrate, through her conduct, the qualifications of
honesty, candor, integrity and trustworthiness necessary to prepare the
Appraisal.

10.     The FDIC subsequently learned that the Appraisal had been
negligently prepared and contained material misrepresentations.

11.     Specifically, upon on information and belief, Pollard failed to
disclose and analyze the Property's listing history, as she certified that she had
done, and as was required by the Uniform Standards of Professional Appraisal
Practice ("USPAP").  Pollard knew (or should have known) of the inflated
increase in the listing price after the Property had stagnated on the open market
at $1,029,000.  The prior listing price was a material fact that should have been
disclosed to IndyMac and should have been analyzed in Pollard's assessment
of the proper valuation of the Property.

12.     In addition, Pollard misrepresented the characteristics of the
Property.  Pollard appraised the Property as a 2,406 square foot single family
residence.  She failed to disclose that the Property was actually a *duplex*, with a
separate kitchen in each unit, even though this fact was clearly indicated in the
Multiple Listing Service report that Pollard claimed to have analyzed.
Categorizing the Property as a single family residence instead of a duplex
enabled Pollard to select superior properties to use as comparable sales.

-7-

13.     Finally, Pollard also included two comparables with lot sizes that were significantly larger than the Property, yet she made only minimal and inappropriate price adjustments to the Property's value.

**C.     The Loan**

14.     Upon information and belief, in reliance upon the information in the loan documents prepared by and submitted by GB Escrow and Messmer, and in reliance on the Appraisal, on or about August 1, 2007, IndyMac funded the Loans.

15.     Had IndyMac known about the misrepresentations in the loan documents, HUD-1 and Appraisal, as set forth above, it could not and would not have funded the Loans.

16.     Plaintiff's damages resulting from Defendants' conduct are currently estimated to exceed $657,198.07.

<u>**FIRST CLAIM FOR RELIEF**</u>

**(Negligence Against Defendants GB Escrow,**

**Messmer, and Does 1 through 10)**

17.     Plaintiff refers to and incorporates by reference the allegations contained in paragraphs 1 through 16 above, as if they were set forth again in full.

18.     Defendants GB Escrow and Messmer performed real estate services in connection with the mortgage loan transaction relating to the Borrower's purchase of the Property.  Defendants were required to perform these services with reasonable care.

19.     Defendants' obligations to IndyMac as settlement agent and real estate broker are defined by federal, state and common law, as well as industry standards.  *See, e.g.,* 2 Miller and Starr California Real Estate § 3:26 (3d ed.) ("Mortgage brokers have a nondelegable fiduciary duty of good faith and full

-8-

1   disclosure to both lenders and borrowers."); *Easton v. Strassburger*, 152 Cal.

2   App. 3d 90, 98, fn. 2 (1984) ("Despite the absence of privity of contract,

3   [Defendant] is clearly under a duty to exercise reasonable care to protect those

4   persons whom the [Defendant] is attempting to induce into entering a real

5   estate transaction for the purpose of earning a commission."); *Norman I. Krug*

6   *Real Estate Investments, Inc. v. Praszker*, 220 Cal. App. 3d 35, 42-43 (1990)

7   (Defendants owed a duty to deal honestly and fairly with all parties in the sale

8   transaction).

9       20.    Defendants breached their duties of good faith and full disclosure

10  when they failed to perform services in a manner consistent with their

11  obligations.

12      21.    Defendants' negligent performance of their duties of good faith

13  and full disclosure caused IndyMac to purchase a mortgage loan that it

14  otherwise would not have purchased.

15

16      22.    Plaintiff has been damaged as a result of Defendants' negligence.

17  Plaintiff's damages are presently believed to be in excess of $657,198.07, plus

18  interest, costs, and attorneys' fees.

19                      **SECOND CLAIM FOR RELIEF**

20                   **NEGLIGENT MISREPRESENTATION**

21   **Against Defendants GB Escrow, Messmer, and Does 11 through 20**

22      23.    Plaintiff refers to and incorporates by reference the allegations

23  contained in paragraphs 1 through 22 above, as if they were set forth again in

24  full.

25      24.    Defendants GB Escrow and Messmer performed real estate

26  services and provided information to IndyMac in connection with the Loans.

27      25.    Defendants owed IndyMac a duty to provide complete and

28  accurate information in connection with the Loan transaction.

COMPLAINT

26.     Defendants were negligent in their preparation, collection,
recording and submission of information to IndyMac.

27.     Defendants breached their duties when they provided inaccurate
and misleading information relating to the Loans.

28.     Defendants' misrepresentations and/or omissions induced
IndyMac to fund Loans that it would not have otherwise funded.

29.     Plaintiff has been damaged as a result of Defendants' negligent
misrepresentations.  Plaintiff's damages are presently believed to be in excess
of $657,198.07 plus interest, costs, and attorneys' fees.

## THIRD CLAIM FOR RELIEF

### BREACH OF CONTRACT – THIRD PARTY BENEFICIARY

### Against Defendants Carina Pollard and Does 21 through 30

30.     The FDIC realleges and incorporates by reference paragraphs 1
through 29, inclusive, of this Complaint.

31.     On or about July 17, 2007, Pollard entered into an agreement to
provide an appraisal of the Property.

32.     Pollard prepared the Appraisal on or about July 17, 2007, and
received valuable consideration in exchange for her appraisal.

33.     In entering into this agreement, Pollard knew that the Appraisal
would be used by a lender such as IndyMac to evaluate the value of the
Property in connection with a mortgage lending transaction.  A lender such as
IndyMac was the intended beneficiary of the agreement.

34.     Pollard breached the contract in that the Appraisal:
(1) misrepresented the value of the Property; (2) used improper and negligently
selected comparable sales; and (3) did not comply with the Uniform Standards
of Professional Appraisal Practice.

-10-

COMPLAINT

35. IndyMac performed and completed all of its obligations owed to Defendants as required, except as to any acts or obligations IndyMac was excused from performing by Defendants' breach.

36. Plaintiff has suffered foreseeable damage as a result of Defendants' breach of the agreements. Plaintiff has suffered damages in an amount to be proven at trial but no less than $657,198.07, plus interest, costs, and attorneys' fees.

## FOURTH CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION

#### Against Defendants Carina Pollard and Does 31 through 40

37. The FDIC realleges and incorporates by reference paragraphs 1 through 36, inclusive, of this Complaint.

38. Pollard prepared the Appraisal on or about July 17, 2007, which misrepresented the value of the Property as $1,250,000.

39. The Appraisal was submitted to IndyMac for the purpose of facilitating a mortgage loan.

40. In preparing the Appraisal, Pollard owed IndyMac a duty to act in accordance with the law and in accordance with the custom, practices and standards of conduct of an appraiser prevailing in the industry.

41. In breach of that duty, the Appraisal contained numerous material misrepresentations, failures and deficiencies including, but not limited to, violations of the Uniform Standards of Professional Appraisal Practice; negligent misrepresentations as to the configuration of the Property; negligent misrepresentations of the value of the Property; and failure to use and analyze appropriate comparable sales.

42. At the time Pollard prepared the Appraisal, she had no reasonable grounds for believing the representations were true. These representations

-11-

were material to IndyMac's decision to fund the Loan, and Pollard intended for lenders such as IndyMac to rely on the representations made in the Appraisal as part of mortgage lending transactions.

43.     IndyMac relied on the representations made by Pollard in the Appraisal in deciding to fund the Loan secured by the Property, and IndyMac further relied upon Pollard to conduct business in accordance with the duty of care implied by the law and the custom of the appraisal industry.  IndyMac reasonably believed that the information submitted by Defendant was true and had been reviewed in accordance with the Uniform Standards of Professional Appraisal Practice and other standards prevalent in the appraisal industry.

44.     Plaintiff has been damaged because it relied upon Pollard's representations, and reasonably believed that Pollard would properly carry out her professional duties, in deciding to fund the Loans secured by the Property.

45.     Plaintiff's damages are presently believed to be in excess of $657,198.07 plus interest, costs, and attorneys' fees.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

1.     For compensatory damages, according to proof at trial, against all Defendants, which are presently estimated to be not less than $657,198.07;

2.     For costs of suit and reasonable attorneys' fees incurred herein;

3.     For prejudgment interest at the legal rate; and

COMPLAINT

1    4.    For such other and further relief as the Court deems just and
2  proper.
3
4  Dated: August 12, 2011                    SNIPPER, WAINER & MARKOFF
5
6                                   By _____
7                                        Maurice Wainer
                                         Attorneys for Plaintiff Federal Deposit
8                                        Insurance Corporation, as Receiver for
9                                        IndyMac Bank, F.S.B.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-13-

COMPLAINT

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action, my business address is 270 North Canon Drive, Beverly Hills, California 90210.

     On August 12, 2011, I served the foregoing document described as: **SUMMONS ON FIRST AMENDED COMPLAINT; FIRST AMENDED COMPLAINT** on interested parties in this action by placing [   ] the original thereof [ ✔ ] a true copy thereof enclosed in sealed envelopes addressed as follows:

       Frances M. O'Meara
       Stephen M. Caine
       Sanjay Bansal
       KAUFMAN, DOLOWICH, VOLUCK & GONZO LLP
       11755 Wilshire Blvd., Suite 2400
       Los Angeles, CA 90025
       *fax* (310) 525-9720

     [ ✔ ]    **BY MAIL:**  I deposited such envelope in the mail at Beverly Hills, California.  The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

     [   ]    **BY FEDERAL EXPRESS:**  I placed such envelope for collection by Federal Express for overnight delivery by next business morning on this date following ordinary business practices.

     [   ]    **BY FAX:**  I faxed such documents pursuant to Los Angeles County Rules of Court §520(c)(4) to the fax number(s) listed above.

     [ ✔ ]    **STATE:** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

     Executed on August 12, 2011, at Beverly Hills, California.

                         E. BRENNINKMEIJER